```
              UNITED STATES DISTRICT COURT
                       FOR THE
                 DISTRICT OF VERMONT
```

COLLEEN AND STEVE LYMAN            :
                                   :
          Plaintiffs,               :
                                   :       Case no. 2:09-cv-262
     v.                             :
                                   :
PFIZER, INC., WYETH, INC.,         :
SCHWARZ PHARMA, INC.,              :
TEVA PHARMACEUTICALS               :
USA, INC., PLIVA USA, INC.,        :
ACTAVIS-ELIZABETH, L.L.C.          :
Individually and as a              :
subsidiary of ACTAVIS, INC.        :
and as successor TO PUREPAC        :
PHARMACEUTICAL, INC,               :
                                   :
          Defendants.               :

## Memorandum Opinion and Order

Plaintiffs Colleen and Steve Lyman have sued several manufacturers of the drug metoclopramide, alleging that they are liable for Colleen Lyman's overexposure to the drug, which caused her to develop tardive dyskinesia, a neurological movement disorder. Defendants Pfizer Inc. and Wyeth LLC (collectively "Wyeth") have moved to disqualify Plaintiffs' expert Dr. Philip Seeman, and to preclude their consultation with him. As grounds, Wyeth contends that Dr. Seeman worked as a consulting expert for Wyeth in connection with a product liability case involving Reglan®, or metoclopramide, and this past employment threatens disclosure of Wyeth's confidential information. The motion, ECF No. 67, is **denied**, for the reasons that follow.

**I.   Background**

Attorneys Jeffrey R. Pilkington and Charles L. Casteel have represented Wyeth in Reglan® products liability litigation since late 1996.  In October 2006 Pilkington contacted Dr. Philip Seeman, a prominent neuropharmacologist on the faculty of the University of Toronto, in connection with defending a metoclopramide case in Texas, *Kettering v. Wyeth*.  He sought Dr. Seeman's expertise to assist him in understanding medical and scientific issues concerning the action of metoclopramide on the brain and its cells.

In a half-hour telephone conference, Pilkington gave Dr. Seeman general information about Reglan® litigation, the nature of the plaintiffs' claims and contentions about metoclopramide, Wyeth's anticipated defenses in the *Kettering* case, and the analyses of plaintiffs' scientific experts.  Dr. Seeman agreed to review some materials, including plaintiffs' expert reports and the studies upon which they relied.

Following the telephone conference the Wyeth attorneys met with Dr. Seeman.  Dr. Seeman provided information about the risk of tardive dyskinesia from taking metoclopramide.  Based upon his review of the literature and his extensive knowledge of the field, Dr. Seeman provided opinions on medical causation and risk of tardive dyskinesia, both issues in the litigation.  The attorneys spoke again with Dr. Seeman in late October, by

telephone, for about an hour.

The Wyeth attorneys requested that Dr. Seeman prepare an expert report for a pending case, *Kettering v. Wyeth*. They prepared a list of questions pertaining to metoclopramide's pharmacological properties, its risk of tardive dyskinesia, and the pathogenesis of tardive dyskinesia in general. The attorneys met again with Dr. Seeman in December 2006 and obtained a written report responding to the questions. According to billing records, Dr. Seeman devoted a total of five and one half hours to discussion with the attorneys, an additional twelve hours of reading research, and six hours preparing his report.

The Wyeth attorneys decided not to disclose Dr. Seeman as a testifying expert. *Kettering* settled. Apart from a brief email exchange in 2008, when Dr. Seeman inquired whether the Wyeth attorneys had ever used his information, he had no further interactions or communications with them.

In his 2006 report for Wyeth, Dr. Seeman opined that metoclopramide, when delivered to the brain at the clinically indicated range, resulted in a much greater risk of tardive dyskinesia than antipsychotic drugs such as haloperidol and chlorpromazine. He concluded that he did not expect metoclopramide to contribute in a major way to tardive dyskinesia.

In April 2009 new research enabled Dr. Seeman to calculate

3

the amount of metoclopramide that entered the brain, and he decided to examine why the annual incidence of metoclopramide-associated tardive dyskinesia appeared to be much higher than the annual incidence of tardive dyskinesia associated with other commonly used antipsychotic drugs.  In May 2010 his article presenting his findings was accepted for publication by the journal "Synapse."

   Attorney Daniel J. McGlynn, counsel for the Lymans as well as other metoclopramide plaintiffs, contacted Dr. Seeman in March 2010 to discuss tardive dyskinesia in connection with metoclopramide and other dopamine blocking drugs.  During his discussion, he learned that Pilkington and Casteel had previously obtained information and opinions from Dr. Seeman.  Dr. Seeman denied having any sort of exclusive or ongoing arrangement with the Wyeth attorneys, or that he had been provided with any confidential information.  McGlynn learned that Dr. Seeman had recently concluded an experiment that purported to show that metoclopramide had a strong propensity to cause tardive dyskinesia, and McGlynn requested that Dr. Seeman provide a report.  Dr. Seeman did so, in June 2010.

   On July 6, 2010, McGlynn's firm disclosed Dr. Seeman as a testifying expert in *Mosley v. Wyeth*, a metoclopramide case pending in the Southern District of Alabama.  Wyeth had been dismissed from the case on summary judgment, and the issue of

whether Dr. Seeman was disqualified was not raised.  The remaining defendants in *Mosley* deposed Dr. Seeman in August, and specifically asked him about his earlier conclusions.  *See* Seeman Dep. 146:11-148:3, Aug. 24, 2010, ECF No. 117-1.

The Wyeth attorneys have requested that counsel for the metoclopramide plaintiffs cease using Dr. Seeman as an expert in this or any other metoclopramide litigation.  Counsel for the metoclopramide plaintiffs have refused to withdraw Dr. Seeman as an expert or to refrain from consulting him.

Defendants Pfizer and Wyeth have now moved to disqualify Dr. Seeman in this case.

## II. Discussion

A federal court has "inherent power to disqualify experts, although cases that grant disqualification are rare."  *Koch Refining Co. v. Jennifer L. Boudreaux M/V*, 85 F.3d 1178, 1181 (5th Cir. 1996) (citation omitted).

The parties agree that in the absence of binding Second Circuit precedent, this Court should undertake a two-part inquiry, asking 1) was it objectively reasonable for the moving party to conclude that a confidential relationship existed; and 2) did the moving party disclose confidential information to the expert?  *See id.; accord Ascom Hasler Mailing Sys., Inc. v. U.S. Postal Serv.*, 267 F.R.D. 9, 12 (D.D.C. 2010); *Lacroix v. BIC Corp.*, 339 F. Supp. 2d 196, 199-200 (D. Mass. 2004); *Hewlett-*

*Packard Co. v. EMC Corp.*, 330 F. Supp. 2d 1087, 1092-93 (N.D. Cal. 2004); *In re Ambassador Group, Inc. Litig.*, 879 F. Supp. 237, 242 (E.D.N.Y. 1994); *Wang Labs., Inc. v. Toshiba Corp.*, 762 F. Supp. 1246, 1248 (E.D. Va. 1991).  Some courts have considered a third factor:  whether the public interest would be served by allowing or not allowing the expert to testify.  *Koch*, 85 F.3d at 1181; *see also Grioli v. Delta Int'l Mach. Corp.*, 395 F. Supp. 2d 11, 14 (E.D.N.Y. 2005); *Lacroix*, 339 F. Supp. 2d at 200; *Hewlett-Packard*, 330 F. Supp. 2d at 1093.

Only if the answers to both questions are "yes," should the expert be disqualified.  *Koch*, 85 F.3d at 1181.  The party seeking disqualification shoulders the burden of proof.  *Id.*

Was it objectively reasonable for Wyeth to conclude that a confidential relationship existed with Dr. Seeman?  The Wyeth attorneys consulted with Dr. Seeman for a brief period in 2006.  They posed a series of textbook questions to him about metoclopramide and the risks of tardive dyskinesia, to which he responded in a brief report.  He was never disclosed as an expert, and the relationship essentially terminated following receipt of the report.  Dr. Seeman did not enter into a formal confidentiality agreement, did not assist in metoclopramide litigation, was not provided with any confidential documents, and did not derive his opinions from studies or experiments funded or directed by Wyeth.  Apparently the Wyeth attorneys did not

communicate to Dr. Seeman the confidential nature of their discussions, nor their expectation that he was no longer free to express his opinions about his field of expertise to other attorneys who inquired.  *See Wang Labs.*, 762 F. Supp. at 1248 ("Lawyers bear a burden to make clear to consultants that retention and a confidential relationship are desired and intended.").  It does not appear that Dr. Seeman learned anything in particular about Wyeth; in fact, he has testified that he did not remember being told who the lawyers represented.

Based on the information provided, Wyeth has not shown that it was objectively reasonable for it to conclude that it had a confidential relationship with Dr. Seeman.

Did Wyeth disclose confidential information to Dr. Seeman? Wyeth asserts that it gave confidential information to Dr. Seeman.  Dr. Seeman does not believe that he received any confidential information.  The declarations supplied by Wyeth do not specify precisely what confidential information was disclosed.  *See Nikkal Indus., Ltd. v. Salton, Inc.*, 689 F. Supp. 187, 191 (S.D.N.Y. 1988) (noting that the party who claims a privilege may not meet its burden by "'mere conclusory or ipse dixit assertions'") (quoting *In re Bonanno*, 344 F.2d 830, 833 (2d Cir. 1965)); *see also Stencel v. Fairchild Corp.*, 174 F. Supp. 2d 1080, 1083 (C.D. Cal. 2001) ("[D]iscussions between . . . counsel and experts do not carry the presumption that confidential

information was exchanged.").

The scientific issues about which the Wyeth attorneys consulted Dr. Seeman would not ordinarily qualify as confidential information.  *See Koch*, 85 F.3d at 1182 ("[P]urely technical information is not confidential.")  Nothing in the report Dr. Seeman provided to Wyeth in 2006 (reviewed in camera) remotely suggests that Dr. Seeman received any confidential information from Wyeth.  To the extent that Wyeth asserts that Dr. Seeman became privy to defense strategies, they would appear to be self-evident, or long-since disclosed:  challenges to the evidence of medical causation and of the degree of risk of developing tardive dyskinesia.  Specific weaknesses or flaws that Wyeth may have identified in the scientific evidence to be used in the *Kettering* case are now four years out of date, and there is no indication that Wyeth intends to pursue a similar strategy in this case, or that any information it provided to Dr. Seeman even remains relevant.

Wyeth has therefore not demonstrated that it divulged confidential information to Dr. Seeman.  This is not a case of an expert who has "switched sides" in the same litigation after having received confidential information.  *Koch*, 85 F.3d at 1181.  Four years elapsed, during which Dr. Seeman did no work for Wyeth.  The instant case is a different lawsuit than the one for which he provided his opinion in 2006.  Dr. Seeman's opinions,

then and now, concern the interpretation of scientific information regarding metoclopramide and the risk of tardive dyskinesia; they do not bear on any responsibility or fault of Wyeth.  Over the years Dr. Seeman's opinions have apparently evolved as new information has become available, and as old information has undergone reinterpretation.  That his opinion on the relative risk of tardive dyskinesia from metoclopramide is now more useful to plaintiffs rather than defendants in metoclopramide litigation will undoubtedly be explored on cross-examination; it is not, however, grounds for disqualification.[1] *See Paul ex rel. Paul v. Rawlings Sporting Goods Co.*, 123 F.R.D. 271, 281 (S.D. Ohio 1988).

Moreover, public policy concerns would not be served by disqualifying Dr. Seeman.  Dr. Seeman is preeminent in his field.  His extensive knowledge and qualifications may well explain why both sides of the metoclopramide litigation have sought his opinion as to whether, how, why and to what extent dopamine blocking drugs such as haloperidol, chlorpromazine and

---

[1] Wyeth asserts that its ability to cross-examine Dr. Seeman is compromised because it will be unable to impeach him with prior inconsistent statements without putting its attorneys on the witness stand.  The Court notes that if Dr. Seeman admits to having made the prior statement, there will be no need for Wyeth's attorneys to testify, because the impeachment is complete.  Should extrinsic evidence of a prior statement become necessary for impeachment at trial, the Court will address the issue, but at this stage of the litigation will not disqualify Dr. Seeman on the basis of speculation about his trial testimony.

metoclopramide cause tardive dyskinesia.  Presentation of those views, subject to cross-examination, provides a source of specialized knowledge intended to assist the trier of fact to understand the evidence.

In sum, Wyeth has not shown that the relationship between the Wyeth attorneys and Dr. Seeman developed to such a point that his disqualification from all future metoclopramide litigation involving Wyeth would be appropriate.  *See id.* at 278 (stating that the proper focus "is to determine, first, whether the attorney . . . acted reasonably in assuming that a confidential . . . relationship of some sort existed, and, if so, whether the relationship developed into a matter sufficiently substantial to make disqualification . . . appropriate.").  Accordingly, Wyeth's motion to disqualify, ECF No. 67, is **denied.**

Dated at Burlington, in the District of Vermont, this 30th day of August, 2011.

/s/ William K. Sessions III
William K. Sessions III
District Judge
